## Case No. 2,727.

### The CIRCASSIAN.

[19 Leg. Int. 220.] [1]

District Court, S. D. Florida. 1862.[2]

PRIZE—INTENT TO VIOLATE BLOCKADE—EVIDENCE.

[1. The act of sailing for a blockaded port with knowledge of the blockade, and an intention to violate it, is of itself an attempt to break it, which will authorize the capture and condemnation of a vessel employed in carrying out the intent of such a voyage.]

[See note at end of case.]

[2. If after the sailing of the vessel, and before her capture, the original purpose is voluntarily abandoned, and the direction and destination of the vessel changed, the original offense will be condoned.]

[See note at end of case.]

[3. A vessel bound from Bordeaux, ostensibly for Havana, was captured about 30 miles from the latter port on suspicion of a purpose to run the blockade. When she was stopped, but before she was boarded, the master destroyed a packet of letters, but from other letters and papers found on the vessel it was evident that the intention was to break the blockade, and discharge the cargo at New Orleans. *Held,* that the ship and cargo should be condemned.]

[See note at end of case.]

[4. As none of the cargo was to be delivered at Havana, the intent to touch there in no way changed the character or extenuated the criminality of the voyage, nor interrupted its continuity.]

[See note at end of case.]

[Proceedings by the United States to condemn the British steamship Circassian, Hunter, master and claimant, and her cargo, as a prize. Decree of condemnation.]

MARVIN, District Judge. This ship of the burden of about 1,500 tons, having a British register, wherein Zachariah Charles Pearson, of London, is stated to be the owner, and Edward Hunter, master, laden with a large and valuable cargo of assorted merchandise, bound from Bordeaux, in France, ostensibly for Havana, in Cuba, was captured on the 4th day of May, 1862, about thirty miles from Havana, by the United States armed vessel, the Somerset, English commanding, on the supposed ground of a purpose to break the blockade of the port of New Orleans, and was sent into this port for adjudication. Breaking through or attempting to break through the cordon of vessels stationed off the blockaded port is not essential to the commission of the offense of breaking a blockade. The act of sailing for a blockaded port, with a knowledge of the blockade, and with an intention to violate it, is itself an attempt to ·break it, which authorizes the immediate capture and condemnation of the vessel and cargo. The capture, however, must be made while the vessel is in delicto,— that is to say, while she is employed in carrying out the illegal purpose with which the voyage was commenced; for it is quite possible that, after the sailing of the vessel, and before her capture, the original purpose may be repented of and voluntarily abandoned, and a new and lawful purpose formed. The direction and destination of the vessel may be voluntarily and wholly changed. If such should be the case, the original offense would be condoned and overlooked, and the vessel and cargo acquitted. The authorities are: The Columbia, 1 C. Rob. Adm. 154; The Neptunus, 2 C. Rob. Adm. 110; The Adelaide, Id. 111, in notes; The Imina, 3 C. Rob. Adm. 167; The Minerva, Id. 229; The Spes & Irene, 5 C. Rob. Adm. 76; Yeaton v. Fry, 5 Cranch [9 U. S.] 335; 1 Duer, Ins. 691, note; 1 Kent, Comm. (5th Ed.) p. 147. Such being the law, it is only necessary to a just decision in the present case to ascertain the facts, and apply the law to the facts as ascertained. The facts are to be ascertained by the testimony, and I think the testimony shows that the ship owner, master, freighters and underwriters got up this voyage, and entered upon its prosecution, with the deliberate purpose of violating the blockade of the port of New Orleans, and that the vessel was taken in delicto.

The testimony consists mainly of letters and other papers found on board the vessel at the time of her capture, and in the legitimate inferences to be drawn from the fact that the master destroyed a package of letters after the vessel had been stopped by the captors, and before they had boarded her. He says, in his deposition: "A package of letters, which were sent on board at Pauillac after the Circassian had cleared from Bordeaux, was burnt after the vessel was hove to, and before the officers of the Somerset came on board at the time of the capture." The chief engineer also testifies to having seen a package of papers put into the furnace at the time referred to. The nature and character of the letters and other papers which escaped the flames, and which are now in evidence before the court, justify the conclusion that the burnt package contained the letters of advice from the shippers to their consignees in New Orleans, enclosing the bills of lading, invoices, etc., and that, if produced, they would show conclusively that it was intended that the vessel should force the blockade of New Orleans, and deliver her cargo in that port. The letters burnt were put on board the vessel just before sailing. The letters preserved were taken from the post office in Bordeaux, and are mostly under cover to persons residing in Havana. It was undoubtedly supposed by the master that these letters possessed no relation to the cargo, and that none of them would disclose the ultimate end of his voyage; otherwise these would probably have shared the fate of the others. But in this supposition he was mistaken. These letters and papers do show that the intention was that the vessel should violate the blockade at New Orleans. There appears to have

---

[1] [Reprinted by permission.]
[2] [Affirmed in 2 Wall. (69 U. S.) 135.]

been no concealment, or disguise of the intentions of the parties concerned in getting up this voyage in Great Britain and France; on the contrary, their intentions seem to have been openly avowed. Messrs. Nartigne & Bigourdan of Bordeaux, writing to Messrs. Carriere & Co., of New Orleans, under date of the 13th March, say: "We are going to have a British steamer here which will take 1000 tons cargo for your port. There will be only about 150 tons of wine and brandy. The rest of the cargo will consist of coffee, preserved meats, &c. This steamer will endeavor to force the blockade. The freight is $40 and ten per cent. per ton, and the British insurance companies have insured against marine and war risks at fifteen per cent. and twenty per cent., and at present they are charging twenty-five per cent. We have shipped nothing by this vessel, because, according to our judgment, this affair has been badly managed. Instead of keeping it a secret, it has been announced in Paris, in London and in Bordeaux. Of course the American government is well informed as to all its details, and if this merchant steamer enters your port it must be because the commanding officer of the blockading squadron closes his eyes; but, if the contrary, she must be captured." Several other letters, some of them from shippers of goods, speak of the purpose of the Circassian to run the blockade. One from Drouet & Gautier, of Bordeaux, to Mr. Victor Maignan, of New Orleans, says: "This will reach you by British steamer Circassian, which arrived in this port a month since to take on board a very fine cargo with which to force the blockade of your port." One from the York Street Flax Spinning Company, Belfast, covering an invoice of linen and cotton goods for their correspondent in New Orleans, says: "We take it for granted that the Circassian, by which we send this, will proceed to New Orleans with her freight." But it is unnecessary to refer to any more of these letters, which may have been written by unauthorized or ill-informed persons, and which speak only in a general way of the purpose of the Circassian to run the blockade, for the fact is clearly proved by a regular business transaction between parties concerned in getting up the voyage. Mr. Eugene Bouvet, of Bordeaux, under date of the 1st of April, 1862, writes to his correspondents, Messrs. Brulatour & Co., of New Orleans, and says: "We enclose you a charter party and private memorandum per Circassian, in order that you may have no difficulty in settling the freight by that vessel." Now, the copy of the charter party enclosed contains an agreement between Z. C. Pearson, the owner of the vessel, and J. Soubey, Esq., "agent to the merchants in Paris," dated at Paris, February 11, 1862; wherein it is agreed that the Circassian shall proceed to Bordeaux, and there load from the factors of the said merchants, a full and complete cargo; "and be-

ing so loaded, shall proceed to Havana, Nassau, or Bermuda, as ordered on sailing, and thence proceed to a port of America and to run the blockade if so ordered by freighters, and to sail for such final port of discharge, within ten days if practicable after receiving such orders, which are to be given immediately on arrival," the freighters to pay freight at the rate of forty dollars per ton of twenty hundred weight, or of forty feet by measurement. There is also in the charter party a stipulation that the ship owner shall not cover more than half the value of the vessel as against war risk. The private memorandum or memorandum of affreightment, enclosed in the letters with the copy of the charter party by which the freight in New Orleans was to be settled, is a printed form, the blanks being filled up as the parties had agreed, wherein the shipper, M. Bouvet, hires of Mr. Soubey, the charterer, the quantity of fifty or sixty-five tons of the ship at the rate of forty dollars per ton, besides ten per cent. average and primage. The agreement then says: "Mr. J. Soubey engages to execute the charter party of affreightment,—that is to say, that the merchandise shall not be disembarked but at the port of New Orleans; and to this effect he engages to force the blockade." The memorandum is signed by Laibertveven "for account and with the authority of J. Soubey," by Eugene Bouvet and by P. Desbordes, who appears to have been the ship's agent at Bordeaux. Now, here appears to be an express agreement between the charterer of the vessel and the shipper, that the goods should not be unloaded at Havana, or any other place than at New Orleans, and for this purpose the charterer binds himself to force the blockade. The owner of the ship binds himself not to insure against war risks over one-half of the value of the ship, and engages that the vessel shall run the blockade if the freighters require. One of the freighters, at least, does require that the vessel shall run the blockade, and exacts a written agreement from the charterer that she shall. He accordingly writes to his correspondent in New Orleans, enclosing the agreement, a bill of lading, and an invoice of goods, and informs him that the premium of insurance will be about twenty-five per cent. Now, is it unreasonable to infer that other freighters, and perhaps nearly or quite every one of them,—some seventeen, at least, in all,—exacted from Mr. Soubey, the charterer of the vessel, a similar agreement; that is to say, that the goods should not be unloaded except at the port of New Orleans, and for that purpose the vessel should run the blockade? It is true no other letter produced before the court besides that of M. Bouvet encloses a copy of the charter party and a memorandum of the affreightment, but it is equally true that not more than three or four of the letters produced have any business relation whatever to this cargo. They relate mostly

to other and different business transactions.

The letters relating to the shipment of this cargo, and which ought to contain the bills of lading, invoices, etc., were burnt by the master, but, had they been preserved and produced here, it is not unreasonable to suppose that they would show that the freighters very generally had taken the precaution which M. Bouvet had, to exact from the charterer a stipulation that their goods should be unloaded only at the port of New Orleans, and that they had effected insurances accordingly. One of the invoices from a house in La Rochelle enclosed to Messrs. Brulatour & Co., of New Orleans, charges the premium of insurance upon the goods shipped, covering marine and war risks, at over twenty-seven per cent. of the value. But, passing by the further consideration of these letters and their enclosures, let us look at the bills of lading taken and kept by the master for his own use and convenience. They are seventeen in number. The master, in his deposition says that they are like those delivered to the shippers. Fourteen of them required the goods to be delivered to the order of the shippers,—two of them to Messrs. Brulatour & Co., who are shown by the correspondence established in New Orleans, and one to Messrs. Leon Pierre & Co., whose residence is not disclosed. Every one of these bills of lading bind the master to carry the goods to Havana, there to receive orders for the final destination of the vessel, and then to deliver them. Not one of these bills of lading calls for a delivery of the goods at Havana. Every one of them calls for a delivery of the goods at some other port after touching at Havana.

Upon the whole, is it possible that testimony could be any more overwhelmingly convincing to prove that ship owner, charterer, shippers, and underwriters, got up and prosecuted this voyage with the deliberate purpose that the vessel, after touching at Havana, should proceed and force her way through the blockading vessels to the port of New Orleans, and there deliver her cargo? The intention to touch at Havana in no way changes the character or extenuates the criminality of the voyage, nor interrupts its continuity. The Richmond, 5 C. Rob. Adm. 325; The William, 5 C. Rob. Adm. 385; The Minerva, 3 C. Rob. Adm. 229; The Imina, Id. 167; The Thomyris, Edw. Adm. 17. The voyage, notwithstanding the intention to touch at Havana, was a voyage to New Orleans, and although the character of the voyage seems to have been quite generally known in London, Paris, and in Bordeaux, yet the attempt is made to conceal and disguise its true character on board the vessel. The vessel is cleared for Havana, the letters on board intended for New Orleans are put under cover and directed to Havana, and the bills of lading conceal the port of delivery. In addition to this, when the vessel is arrested by the Somerset, important letters and papers are destroyed. The case is too plain to my mind to admit of any argument. A simple statement of the facts decided it. The parties concerned engaged in a speculation; they took a risk. Had they succeeded they would have made large profits. They have failed. They are caught in delicto. They will not now probably deem it unreasonable if they are called upon to submit to corresponding losses. A decree of condemnation of ship and cargo must be entered.

[NOTE. The claimant appealed to the supreme court, which affirmed the decree of the district court. The following is the substance of the opinion of the majority of the court, delivered by Mr. Chief Justice Chase, for the affirmance: The blockade of New Orleans was not terminated by the military occupation by the United States forces on May 1, 1862, but was in force on May 4, 1862, the date of the capture of the Circassian, and the evidence established the contention of the captors that, at the time of the capture, the intention of the vessel was to violate the blockade, and consequently she was liable to capture as prize. The Circassian, 2 Wall. (69 U. S.) 135.]